UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                  :

GEORGE ABDELSAYED,             :

                                  :

                      Plaintiff,    :                              17-CV-9606 (VSB)

                 - against -          :

                                  :                 **OPINION & ORDER**

NEW YORK UNIVERSITY, NYU    :
LANGONE MEDICAL CENTER, NYU  :
SCHOOL OF MEDICINE, & NYU    :
LANGONE HOSPITAL-BROOKLYN F/K/A :
NYU LUTHERAN MEDICAL CENTER,  :

                                  :

                    Defendants.  :

                                  :
-------------------------------------------------------X

<u>Appearances</u>:

Lauren Goldberg
Law Offices of Lauren Goldberg
New York, New York
*Counsel for Plaintiff*

Anjanette Cabrera
Stephen Strecker
Timothy M. Barbetta
Constangy, Brooks, Smith & Prophete, LLC
New York, New York
*Counsel for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       Plaintiff George Abdelsayed ("Plaintiff") brings this action against Defendants New York

University, NYU Langone Medical Center, NYU School of Medicine, and NYU Langone

Hospital-Brooklyn (together, "NYU" or "Defendants") for breach of contract and alleged

violations of the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 296

*et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code § 8-107

*et. seq.*  Before me are Defendants' motion for summary judgment and motion to exclude the

testimony of Plaintiff expert Dr. Susan Williams.  Defendants' motion to exclude the testimony

of Dr. Williams is GRANTED.  Furthermore, because I find that the material facts are

undisputed that Plaintiff's proposed accommodations are not reasonable and would create undue

hardship for Defendants and that Defendants did not breach Plaintiff's employment contract,

Defendants' motion for summary judgment is GRANTED.

## I.   **Factual Background**[1]

Plaintiff worked as the Section Chief of Gastroenterology at NYU Langone Hospital-

Brooklyn from September 2016 until he took a leave of absence in March 2017.  (56.1 ¶¶ 14,

16.)[2]  Plaintiff's direct supervisors were Dr. Frank Volpicelli, the Chief of Medicine at NYU, and

Dr. Mark Pochapin, the Director of NYU's Division of Gastroenterology.  (*Id*. ¶ 15.)  From

September 2016 until his leave of absence in March 2017, Plaintiff performed general

procedures, such as colonoscopies and endoscopies, as well as advanced procedures, including

Endoscopic Retrograde Cholangio-Pancreatography ("ERCP") procedures.  (*Id.* ¶¶ 3, 16, 17)

(admitting that Plaintiff performed ERCP).)

In February 2017, Plaintiff met with Dr. John Bendo, a neurosurgeon at NYU, for a

spinal evaluation.  (*Id*. ¶ 18.)  Plaintiff complained of functional impairment in his left upper

extremities and right arm pain, including "numbness and tingling."  (*Id*.)  Dr. Bendo diagnosed

Plaintiff with several degenerative musculoskeletal conditions, including multilevel cord

compression, multilevel severe cervical stenosis, and cervical radiculopathy.  (*Id*.)  Plaintiff

---

[1] This section is drawn from the parties' various submissions in order to provide background and context for the motion for summary judgment and is not intended as a recitation of all material undisputed facts.  Unless otherwise indicated, the facts set forth in this section are undisputed or undisputed to the degree recounted in this Opinion & Order.

[2] "56.1" refers to Plaintiff's Counterstatement of Facts Pursuant to Rule 56.1, which incorporates both Defendants' Rule 56.1 Statement and Plaintiff's responses.  (Doc. 119.)

shared the diagnosis with Dr. Volpicelli and told him that he was worried that, due to his condition, he was not performing endoscopies safely. (*Id.*) The Parties dispute the precise content and outcome of that conversation but agree that, as a result of the conversation with Dr. Volpicelli, Plaintiff stopped performing endoscopic procedures, and took time off from work to seek medical treatment. (*Id.* ¶ 20.)

Plaintiff then saw another neurosurgeon at NYU, Dr. Michael Smith. (*Id.* ¶ 21.) Plaintiff told Dr. Smith that he was experiencing "severe pain throughout his right arm [as well as] weakness in his left shoulder and bicep area and this has interfered with his ability to work, particularly doing endoscopy procedures." (*Id.*) Dr. Smith recommended that Plaintiff undergo anterior cervical discectomy and fusion ("ACDF") surgery. (*Id.*) The day before his surgery, Plaintiff told Dr. Howard Weintraub, a cardiologist at NYU, that he was unable to perform endoscopies as he had been. (*Id.* ¶ 22.)

Plaintiff underwent ACDF surgery on March 16, 2017, in an effort to decompress his spine and nerves. (*Id.* ¶ 23.) NYU granted Plaintiff an extended medical leave of absence beginning on that day. (*Id.* ¶ 24.) Plaintiff's surgery was unsuccessful, and he continued to experience the same sensations and limitations. (*Id.* ¶ 25.)

In May 2017, Plaintiff saw Dr. Rachid Assina, a neurosurgeon at Rutgers University Medical School. (*Id.* ¶ 26.) Plaintiff told Dr. Assina that "[p]rior to surgery, he was unable to perform his job" because he could not "hold the endoscope with his left upper extremity." (*Id.* ¶ 27.)[3] Plaintiff told Dr. Assina that he had the "same symptoms" and "same exact pain" that he had prior to surgery and did "not feel that he had any improvement postoperatively." (*Id.*) Dr.

---

[3] Parties dispute whether the statement was "left arm" or "upper left extremity" but this distinction is not relevant for present purposes.

Assina told Plaintiff that he was not cleared for work and would be reassessed in six weeks.  (*Id.*)  Although the parties dispute precisely what Dr. Assina told Plaintiff in this July 2017 follow-up, it is undisputed that Dr. Assina's medical records indicate that Plaintiff told him that "[h]is symptoms have not improved at all after surgery." (*Id.* ¶ 28.)  Dr. Assina indicated at that time that there might be a need for further surgery and that Plaintiff was not fit for work.  (*Id.*)

From March 2017 through August 2017, Plaintiff communicated with Dr. Volpicelli and Dr. Pochapin regarding his medical status and his ability to return to work.  (*Id.* ¶ 29.)  In August 2017, Plaintiff was referred to Evelyn Taveras, Employee and Labor Relations Manager in NYU's Human Resources Department ("HR"), who thereafter communicated with Plaintiff directly.  (*Id.* ¶ 30.)  On August 23, 2017, Plaintiff emailed Taveras to inform her that he had another appointment with Dr. Assina in September.  (*Id.* ¶ 31.)  Taveras notified Plaintiff that NYU's policy was to provide six months of leave within a 52-week period and, therefore, his leave was to set to expire on September 15, 2017.  (*Id.* ¶ 32.)  Taveras told Plaintiff that he needed to advise her when he could return to work and to provide supporting documentation from his doctor.  (*Id.*)[4]  When Plaintiff's leave of absence expired on September 15, 2017, NYU did not terminate his employment but extended his leave of absence.  (*Id.* ¶ 33.)  Taveras emailed Plaintiff on September 19, 2017, for an update concerning his ability to return to work.  (*Id.*)

On September 26, 2017, Plaintiff emailed a copy of Dr. Assina's medical report on his condition to Taveras, copying Dr. Pochapin and Dr. Volpicelli.  (*Id.* ¶ 35.)  Dr. Assina indicated in his report that Plaintiff's "main issue involves pain, extremity numbness and weakness, particularly with prolonged standing and prolonged manual labor, the latter for example such as

---

[4] It is unclear if Dr. Assina was deposed about his evaluation of the Plaintiff.  In any case, neither party relied on a deposition of Dr. Assina in their motions for summary judgment.

transcribing office notes and consultations on computer keyboard." (*Id*. ¶ 39.)  Although the parties dispute the exact content of the Dr. Assina's report, it is uncontested that Plaintiff described his "'pain as shooting in nature, 8-9/10 on the visual analog scale' that 'increased with all activities.'" (*Id*. ¶ 36.)  However, Dr. Assina opined that Plaintiff could return to work if he received three permanent accommodations. (*Id*. ¶ 40.)  Specifically, Dr. Assina recommended that (1) "[a] seating arrangement should be available for prolonged procedures, such as those lasting longer than 20 to 30 minutes"; (2) "[Plaintiff] cannot perform any procedures that are inherently long and require the use of heavy equipment such as lead apron"; and (3) "[f]loor teaching and work rounds should be ideally performed at a central station where seats are available." (*Id*.)

Upon receiving Dr. Assina's report, NYU's Division of Gastroenterology, Department of Medicine, and Department of HR reviewed and discussed the findings as applied to Plaintiff's situation. (*Id*. ¶ 41.)  Several physicians and representatives from these meetings, including Dr. Pochapin, drafted a document concluding that Plaintiff could not safely perform his duties as Section Chief of Gastroenterology if NYU granted his requested accommodations and allowed him to return to work. (*Id*. ¶¶ 47, 50.)  Taveras conveyed the conclusion to Plaintiff by telephone on October 9, 2017, and followed up with an email requesting that if Plaintiff intended on providing any "additional medical documentation about accommodations" that he do so by October 16, 2017. (*Id*. ¶ 51.)  The parties dispute the precise characterization of what happened next but agree that Plaintiff did not submit any additional medical documentation about other possible accommodations. (*Id*. ¶ 52.)  On October 17, 2017, Taveras informed Plaintiff that his employment was being terminated and advised him to continue discussing his long-term disability benefits application with Cigna. (*Id*. ¶ 54.)

Plaintiff was approved for social security disability insurance ("SSDI") benefits with a start date of September 2017.  (*Id*. ¶ 59.)  Plaintiff stated in his application for benefits that he is "unable to work because of [his] disabling condition on March 14, 2017" and cited "severe pain" in his neck, arms, lower back, legs, and feet as well as "numbness" in his hands.  (*Id*. ¶¶ 60–61.)  Plaintiff also stated he was unable to lift certain weight over his head, could not sit for prolonged periods of time, and was limited in how far he could walk at a time.  (*Id*. ¶ 60.)  Plaintiff also applied for long-term disability ("LTD") benefits with Cigna, and his application was approved with a benefit start date of September 2017.  (*Id*. ¶ 62.)  Plaintiff stated the following in his Cigna LTD application:

> The main scope of my job is the performance of gastrointestinal endoscopy.  This requires the support of the endoscope with my left hand and steering it with the right hand.  I suffer from severe cervical radiculopathy; this is a condition where the nerve roots that exit from the spinal cord in my neck are severely compressed.  This compression results in loss of sensation in my arms and hands and numbness (severe) in both arms & hands.  This makes manipulation and coordination of the instrument difficult.  Also, because the nerves that supply my arm and shoulder muscles are affected and damaged, the muscles (biceps, shoulder and others) are very weak, making it extremely difficult to lift and support the weight of the endoscope.  The other problem I suffer from is severe lumbar (spinal) stenosis, which results in severe pain, loss of sensation and numbness in both legs after standing or walking, even for a brief period of time.  This makes the performance of procedures and my clinical patient care duties very difficult.

(*Id*. ¶ 63.)

## II.  <u>Procedural History</u>

Plaintiff filed his Complaint on December 7, 2017.  (Doc. 1 ("Compl.").)  Plaintiff's Complaint alleged Defendants unlawfully discriminated against him on the basis of his disability in violation of the NYSHRL and the NYCHRL.  (*Id*. ¶ 1.)  Plaintiff also asserted a claim for breach of contract, alleging Defendants failed to engage in the interactive process as required by his employment agreement.  (*Id*.)  Defendants filed an answer on February 22, 2018, and an

amended answer on April 26, 2018.  (Docs. 21, 24.)

On May 29, 2020, Defendants filed a motion for summary judgment, (Doc. 103), a supporting memorandum of law, (Doc. 105 ("MSJ")), the declaration of Dr. Mark Pochapin (Doc. 106 ("Pochapin Decl.")), the declaration of Anjanette Cabrera (Doc. 107), and the supporting Statement of Material Facts, (Doc. 105-1.)  That same day, Defendants filed a motion to preclude the testimony of Plaintiff's expert witness, Dr. Susan Williams, (Doc. 108), and a supporting memorandum of law, (Doc. 109 ("Daubert").)  On August 19, 2020, Plaintiff filed a memorandum of law in opposition to Defendants' motion for summary judgment, (Doc. 116 ("Pl. Opp.")), the declaration of Lauren Goldberg, (Doc. 117), the declaration of Plaintiff Dr. George Abdelsayed (Doc. 118 ("Abdelsayed Decl."), and the Counterstatement of Facts Pursuant to Rule 56.1.  Plaintiff also filed a memorandum of law in opposition to Defendants' motion to preclude the testimony of Dr. Susan Williams, (Doc. 120 ("Daubert Opp.")), the declaration of Dr. George Abdelsayed, (Doc. 122), and the declaration of Lauren Goldberg, (Doc. 121.)  Defendants filed their reply memorandum of law in support of their motion for summary judgment on October 7, 2020, (Doc. 126 ("Reply")), along with the declaration of Dr. Mark Pochapin, (Doc. 128.)  That same day, Defendants filed their reply memorandum of law in support of their motion to preclude the testimony of Dr. Susan Williams, (Doc. 127 ("Daubert Reply")), and the declaration of Dr. Mark Pochapin, (Doc. 129.)

III.   **Legal Standards**

A.   ***Motion to Preclude Expert Testimony***

The admissibility of expert testimony is governed by Fed. R. Evid. 702.  This provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of

fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*[5]  Courts in this Circuit frequently distill this down to a three-part test that requires the

proponent of expert evidence to show "that (1) the expert is qualified; (2) the proposed opinion is

based on reliable data and methodology; and (3) the proposed testimony would be helpful to the

trier of fact."  *Valelly v. Lynch*, No. 19-CV-7998 (VEC), 2023 WL 2918982, at *4 (S.D.N.Y.

Apr. 12, 2023).

　　"The party proffering expert testimony 'bears the burden of establishing these

admissibility requirements.'"  *In re: TERRORIST ATTACKS ON SEPTEMBER 11, 2001*, No.

03MD01570GBDSN, 2023 WL 3116763, at *2 (S.D.N.Y. Apr. 27, 2023) (quoting *In re Vivendi,*

*S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016)).  This showing must be made by a

preponderance of the evidence.  *Passman v. Peloton Interactive, Inc.*, No. 19-CV-11711 (LJL),

2023 WL 3195941, at *3 (S.D.N.Y. May 2, 2023).  More specifically, the proponent must show

each of the three reliability components of Fed. R. Evid. 702, *i.e.*, Fed. R. Evid. 702(b)–(d), by a

preponderance of the evidence.  *See* Fed. R. Evid. 702 advisory committee's note to the 2023

amendment ("The [2023] amendment clarifies that the preponderance standard applies to the

three reliability-based requirements added in 2000--requirements that many courts have

---

[5] Changes to this Rule are expected to go into effect on December 1, 2023.  *See* Fed. R. Evid. 702, 2023 advisory committee notes.  These changes, however, do not substantively change the law of  Fed. R. Evid. 702.  Rather, they clarify issues such as the applicability of the preponderance of evidence or "more likely than not" standard that the Advisory Committee felt was not being correctly applied by judges.  *See id.* ("Nothing in the [2023] amendment imposes any new, specific procedures.  Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702.")

incorrectly determined to be governed by the more permissive Rule 104(b) standard.")  Fed. R. Evid. 702 thus imposes on the trial judge a "basic gatekeeping obligation" to ensure that all expert testimony admitted at trial is relevant and reliable, regardless of whether the expert testimony is on scientific, technical, or other specialized matters.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999).

To assist with the task of determining the reliability of expert testimony, *Daubert v. Merrel Dow Pharms., Inc.*, provides the trial court with five non-exclusive factors to apply to the expert's reasoning or methodology:  (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error;" (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique is generally accepted in the relevant scientific community.  *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993).  These factors do not constitute a "definitive checklist or test"; rather, "the inquiry envisioned by Rule 702 is . . . a flexible one."  *Id.*

"[T]he Supreme Court has made clear that the *Daubert* factors are only to be applied where it makes sense to do so."  *Emig v. Electrolux Home Prod. Inc.,* No. 06-CV-4791 (KMK), 2008 WL 4200988, at *6 (S.D.N.Y. Sept. 11, 2008) (citing *Kumho Tire Co.*, 526 U.S. at 151).  In cases where the *Daubert* factors do not fit easily, including when the testimony is based on the expert's own personal experience, it instead makes sense to assess reliability based on how the expert's experience leads to her conclusions, why that experience is a sufficient basis, and how the experience reliably applies to the facts.  *Id.* at *8; *see also Liriano v. Hobart Corp.*, 949 F. Supp. 171, 177 (S.D.N.Y. 1996) ("Properly understood, the *Daubert* analysis applies to cases involving unique, untested, or controversial methodologies or techniques.  It is not appropriate to

invoke the *Daubert* test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique." (internal citation omitted)).

"A court may [also] conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997). "Neither 'Daubert [n]or the Federal Rules of Evidence require[ ] a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *PharmacyChecker.com v. Nat'l Ass'n of Boards of Pharmacy*, No. 19-CV-7577 (KMK), 2023 WL 2973038, at *18 (S.D.N.Y. Mar. 28, 2023) (quoting *Nimely v. City of New York*, 414 F.3d 381, 394 (2d Cir. 2005)) (alterations in original). Thus, "expert testimony should be excluded" if it is "in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (cleaned up). Similarly, "[e]ven otherwise qualified experts may not simply offer conclusory opinions." *Jinn v. Sig Sauer, Inc.*, No. 20CV1122PGGRWL, 2023 WL 2919558, at *3 (S.D.N.Y. Apr. 12, 2023).

On a motion for summary judgment, if the evidence in the form of expert testimony is excluded under Fed. R. Evid. 702, the court must make its summary judgment decision based upon a record that does not include that evidence. *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001). The standard for admissibility of evidence under Fed. R. Evid. 702 is the same at summary judgment as it is at trial. *Id.*; *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("The court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment.").

### B.  *Motion for Summary Judgment*

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in their favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

Additionally, in considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## IV. Discussion

### A. *Motion to Preclude the Expert Testimony of Dr. Susan Williams*

Dr. Williams's expert opinion must be excluded as unreliable. She proffers, in essence, four opinions: (1) that Plaintiff could perform endoscopies with certain accommodations and adjustments; (2) that Defendants could have implemented those accommodations without negative effects on patient safety; (3) that implementing these accommodations would have permitted Plaintiff to continue to perform endoscopies without negative effects on patient safety; and (4) that Defendants could have implemented to allow Plaintiff to perform other administrative duties. (Doc. 109-1 ("Williams Report") 8–9.)

Dr. Williams bases her opinion primarily on her thirty years of experience as a gastroenterologist. (*Id.* 2.) After suffering from osteoarthritis in both knees, Dr. Williams was forced to sit throughout most of her procedures for the last twenty years of her career. (*Id.*)

During that time, Dr. Williams worked as the site coordinator for the Metropolitan Hospital component of New York Medical Center ("NYMC") and the program director for the NYMC/Metropolitan-Woodhull gastroenterology training program. (*Id.*) Dr. Williams describes

the methodology she used when performing endoscopies while seated in her expert report stating

that she "used a stool with a wide seat and base, usually with rollers so that [she] was able to

position [herself] immediately next to the stretcher or bed and could easier change [her] angle in

relation to the patient." (*Id*.) She also notes the outcome of utilizing such a methodology,

including that she found her "maneuverability while seated equivalent to that while standing,"

and that she never received any negative feedback regarding her use of the "sitting technique"

and in fact received comparable to or better patient safety and quality-of-care statistics than other

endoscopists in her unit. (*Id*. 2–3.) Dr. Williams also asserts that, after performing significant

portions of procedures in the seated position, she was more efficiently able to stand if standing

achieved a better position or use of body mobility for the task at hand. (*Id*. 4.) She states that

she "successfully performed hundreds of emergency and/or prolonged and technically

challenging procedures operating primarily in the seated position." (*Id*. 6.)

Dr. Williams supplements this personal experience with three articles:[6] (1) "Ergonomics

and Endoscopic Related Injuries" by Dr. Menhaz Shafi, an article in the American

Gastroenterological Association publication AGA Perspectives; (2) "The SET Maneuvers for

Reducing Left-Hand Strain While Doing Colonoscopy in a Sitting Position" by Dr. Chi-Tan Hu,

a letter to the editor of a medical journal; and (3) "Ergonomics and GI Endoscopy," by Dr.

Amandeep K. Shergill, et al., a review of studies evaluating injuries in endoscopists. (*Id*. 4–5.)

In these articles, Drs. Shafi and Hu describe reports from their colleagues about performing

---

[6] Dr. Williams's Report purports to draw further support from other unnamed sources and information from national conferences. (Williams Report 6.) The fact that these sources are not cited and that their content is thus unverifiable is a further reason to exclude Dr. Williams's testimony. *See, e.g.*, *Bell v. JPMorgan Chase Bank*, N.A., No. 20CIV2468PGGSLC, 2023 WL 2772033, at *3 (S.D.N.Y. Apr. 4, 2023) (excluding testimony where among other issues, it was "not clear what 'facts or data' the expert relied on); *see also Hayes Outdoor Media, LLC v. S. Tr. Ins. Co.*, 574 F. Supp. 3d 565, 569 (W.D. Tenn. 2021) ("Neither party has described the source of the weather data cited by [the experts]. This underlying data also requires authentication of some kind in order to satisfy the Rules of Evidence and *Daubert*.")(citing *Lyngaas v. Ag*, 992 F.3d 412, 431 (6th Cir. 2021)).

various procedures while seated, but neither article mentions whether the physicians were performing procedures while seated as an accommodation for physical limitations. (*Id.* 5) Dr. Shergill's article does not discuss the viability of performing procedures seated at all.

The analytic gap between this data and the opinions Dr. Williams renders is too great to admit her testimony. Neither Dr. Williams's personal experience nor the articles she cites speak to whether Plaintiff could safety perform endoscopies given his physical limitations using the accommodations he seeks. Critically, Dr. Williams does not address Plaintiff's proposed limitation on the use of heavy equipment such as lead aprons at all, (*see generally id.*), and acknowledged as much in her deposition, (Williams Dep. 33:25-34:22).[7] Thus, while Dr. Williams opines that Plaintiff could perform his job with Plaintiff's proposed accommodations, she does not discuss the limitation on the use of lead aprons or other heavy equipment.

Dr. Williams's opinion on Plaintiff's ability to work while seated without any impact on patient safety is also inadequately supported. None of the articles Dr. Williams cites address the impact of physical limitations or disabilities on gastroenterologists' ability to perform endoscopies and whether sitting is a viable means of mitigating those limitations or disabilities. Additionally, Dr. Williams acknowledged that two of the three sources (articles by Dr. Shafi and Dr. Chi-Tan Hu) cited in her report did not discuss patient safety at all. (*Id.* 40:7-9, 41:10-11). Dr. Shergill's article does not address patient safety either. Thus, Dr. Williams's academic sources do not speak to or provide a foundation for her ultimate opinion that sitting was a reasonable accommodation that would have permitted Plaintiff to perform his duties with no impact on patient safety.

---

[7] "Williams Dep." refers to the transcript of the deposition of Dr. Susan Williams taken on January 17, 2020. (Doc. 109-2.)

This leaves Dr. Williams's experience as the basis for her opinions; however, her experience is not sufficiently comparable to Plaintiff's.  Dr. William's limiting injury was "osteoarthritis in both knees" leading to "knee and back pain on standing in one place." (Williams Report 2.)  She does not report any arm or upper extremity limitations.  Conversely, Plaintiff was diagnosed with degenerative musculoskeletal conditions, including multilevel cord compression, multilevel severe cervical stenosis, and cervical radiculopathy.  (56.1 ¶ 18.)  He also noted "severe pain throughout his right arm [as well as] weakness in his left shoulder and bicep area and this has interfered with his ability to work, particularly doing endoscopy procedures."  (*Id.* ¶ 21.)  The facial differences between Dr. Williams's limitations based on her osteoarthritis in her legs and Plaintiff's arm and spinal injuries are thus substantial.  While Dr. Williams indicates that she reviewed Plaintiff's medical records, (Williams Report 1), nowhere in her report does she do any analysis to suggest that her physical limitations and Plaintiff's are sufficiently comparable for her experience to be a viable point of comparison for Plaintiff's.

As a result of their differing ailments, Dr. Williams and Plaintiff had materially different limitations.  This is reflected in what their proposed (in Plaintiff's case) or actual (in Dr. Williams's case) accommodations permitted them to do in their work.  For example, one of the accommodations Plaintiff sought was not to "perform any procedures that are inherently long." (*Id.* ¶ 40.)  Conversely, Dr. Williams noted that she has "successfully performed hundreds of emergency and/or prolonged and technically challenging procedures operating primarily in the seated position."  (Williams Report 6).  Additionally, Dr. Williams was able to address her physical limitations by sitting during procedures when she could but standing when circumstances required.  (*Id.* 2 ("I was able throughout this period to, as needed, stand up as necessary if required for a particular maneuver.")).  Thus, while sitting was her "default"

position, (*id.*), nothing in her report suggests that she was unable to stand whenever, and for however long, the situation required. Plaintiff, by contrast, would not be able to perform any inherently long procedures even with the aid of a seat. As a final example, Plaintiff indicated that he was unable to "hold the endoscope with his left upper extremity," (56.1 ¶ 27), and his proposed accommodation included a bar on doing procedures that required heavy equipment such as lead aprons. (*Id.* ¶ 40.) Conversely, Dr. Williams does not report any physical limitations with her upper extremities or use of heavy equipment. As noted, she does not discuss the safety impact of the proposed accommodation to not use heavy equipment at all.

Given this, "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 144. None of the literature Dr. Williams refers to discusses the issue on which she opines: whether the accommodations sought by Plaintiff would have permitted him to do the job at issue without risk to patient safety. Dr. Williams's own experiences are vastly different from Plaintiff's given the material differences in their physical limitations, and she does not discuss the impact of Plaintiff's inability to use heavy equipment during procedures at all. Thus, the use of her experience as a basis to determine that Plaintiff could similarly be accommodated without risking patient safety is thus the kind of "apples to oranges" comparison that merits exclusion. *Boucher*, 73 F.3d at 21. Dr. Williams's testimony is therefore excluded, and I do not consider it in the context of the summary judgment motion.

### B. *Motion for Summary Judgment*

#### 1. Judicial Estoppel

##### a. Applicable Law

Under the NYSHRL and NYCHRL, a plaintiff must show that he can perform the essential duties of his job. *Benimovich v. Fieldston Operating LLC*, 2013 WL 1189480, at *7

16

(S.D.N.Y. Mar. 22, 2013).  In contrast, an applicant for disability benefits must show that he is disabled and thus cannot work.  *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 801 (1999).  An application for disability benefits and disability discrimination claims thus "incorporate two directly conflicting propositions, namely 'I am too disabled to work' and 'I am not too disabled to work.'"  *Id.* at 802.  "When an individual's prior submission regarding his disability to an adjudicatory body contains a purely factual statement that directly contradicts a statement made in a subsequent [disability discrimination] claim, and the two cannot be reconciled with any amount of explanation, judicial estoppel will preclude" that claim.  *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 119 (2d Cir. 2004) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 333 (2d Cir. 2000)).  The receipt of SSDI benefits does not create a presumption precluding the plaintiff from making disability discrimination claims.  *Cleveland*, 526 U.S. at 608.  However, a plaintiff must "proffer a sufficient explanation" for the "apparent contradiction that arises out of the earlier SSDI total disability claim."  *Id.*  "[An] explanation is warranted . . . where the conflict involves a legal conclusion.  When faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of a [disability discrimination] claim."  *Id.* at 807; *see also James v. Trustees of Columbia Univ. in City of New York*, 2003 WL 23018797, at *5 (S.D.N.Y. Dec. 22, 2003) ("Lower courts have since applied *Cleveland* not only to the receipt of Social Security benefits but to awards of long-term disability benefits as well.").

b.  Application

Defendants claim that, under the judicial estoppel doctrine, Plaintiff's statements to the Social Security Administration ("SSA") and Cigna regarding his disability bar him from claiming that he was able to continue working at NYU.  Defendants focus their argument on the

contradictions between Plaintiff's representation to the SSA that he was "unable to work because of [his] disabling condition," (MSJ 15; 56.1 ¶ 61), and the representation in Plaintiff's Complaint that he was still able to work despite his physical condition, (*see, e.g.*, Compl. ¶ 30). Additionally, Plaintiff represented to Cigna that he was unable to safely control an endoscope because of numbness, weakness, and pain in his arms and hands, (56.1 ¶ 61), yet now represents that he was still able to safely perform gastrointestinal endoscopy with reasonable accommodations, (*see, e.g.*, Compl. ¶ 33).  Plaintiff argues that the statements concerning his disability are reconcilable by the explanation that he could have continued working at NYU had his accommodation requests been granted.  (Pl. Opp. 21.)

Defendants emphasize the standard articulated in *Parker v. Columbia Pictures Indus.* in an effort to demonstrate that Plaintiff cannot adequately explain the contradiction.  (Reply 7 (citing *Parker*, 204 F.3d at 333.))  *Parker* held that a plaintiff's explanation of a contradiction between statements in an application for disability benefits and his claim for disability discrimination "must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of the job, with or without reasonable accommodation."  204 F.3d at 333.  In applying *Parker*, Defendants appear to interpret the clause "with or without reasonable accommodation" to require Plaintiff to show he could continue in his position without accommodations.  However, *Parker*, and recent cases in this Circuit applying it,[8] demonstrate that is not the proper interpretation.  *Parker* held that the

---

[8] *See also Tse v. New York Univ.*, 190 F. Supp. 3d 366, 370 (S.D.N.Y. 2016) (holding that the plaintiff's explanation was sufficient to overcome summary judgment—"namely, that she was consistently able to perform her essential job functions with the [accommodations] . . . and only became unable to do her job after being removed from the [] position and losing the accommodations that NYU had provided previously."); *Jernigan v. Dalton Mgmt. Co., LLC*, 819 F. Supp. 2d 282, 289 (S.D.N.Y. 2011) ("These statements are, however, entirely consistent with [the plaintiff's] statements in this action for relief under the ADA, and do not preclude the possibility that [the plaintiff] could have—with or without reasonable accommodation—performed all of the essential functions of his position.");

plaintiff's explanation for the contradiction was sufficient to survive summary judgment because "a reasonable jury could find that [the plaintiff's] description of himself as 'completely incapacitated—disabled' referred to [Defendant's] explanation for terminating him and not to whether he was capable of performing the essential functions of the job with reasonable accommodation." *Id.* at 335.  This is exactly the explanation Plaintiff offers.  According to Plaintiff, NYU deemed him disabled and terminated his position, but he could have continued to perform his job with the proposed accommodations.  Therefore, I find that Plaintiff's explanation that he could have continued to perform his job duties had he received reasonable accommodations defeats estoppel.

## 2. Failure to Reasonably Accommodate

### a. Applicable Law

#### i. *Failure to Accommodate*

Claims brought under the NYSHRL for failure to accommodate are analyzed under a burden-shifting framework.  *See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999).  To maintain a prima facie claim under the NYSHRL for failure to accommodate, "an employee must show that: '(1) he is a person with a disability under the meaning of the [NYSHRL]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, the employee could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'"  *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).  Under the burden-

---

*DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 104 (2d Cir. 2010) ("With the context of the statements thus understood, the apparent contradiction between [the plaintiff's] statements that he is limited in social circumstances, but still able to perform the conditions of his employment with a no-longer-available accommodation, is reconcilable").

shifting framework applied in these cases, after the plaintiff satisfies his burden of "production and persuasion as to the existence of an accommodation that is facially reasonable," the burden "shifts to the defendant to rebut the reasonableness of the proposed accommodation," which "is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016) (internal quotation marks omitted). "Summary judgment is . . . appropriate where a plaintiff fails to identify a facially reasonable accommodation that the defendant refused to provide, or when the employer offers an accommodation that is plainly reasonable." *Gronne v. Apple Bank for Sav.*, 1 F. App'x 64, 67 (2d Cir. 2001) (summary order) (citation and internal quotation marks omitted).

"A reasonable accommodation is one that 'enables an individual with a disability who is qualified to perform the essential functions of that position . . . or to enjoy equal benefits and privileges of employment.'" *Noll*, 787 F.3d at 94 (quoting 29 C.F.R. § 1630.2(o)(1)). A reasonable accommodation can "take many forms, but it must be effective." *Id.* at 95; *see also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Sciences*, 804 F.3d 178, 189 (2d Cir. 2015) ("The hallmark of a reasonable accommodation is effectiveness."). However, an employer is "not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll*, 787 F.3d at 95; *see also Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 479 (S.D.N.Y. 2013) ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." (citation omitted)). Given that the determination of whether something constitutes a reasonable accommodation "is necessarily fact-specific[,] . . . determinations on this issue must be made on

a case-by-case basis." *Wernick v. Fed. Rsrv. Bank of New York*, 91 F.3d 379, 385 (2d Cir. 1996).

The NYCHRL defines "reasonable accommodation" as any "such accommodation that can be made that shall not cause undue hardship in the conduct of the [employer's] business." *Id.* at 74; NYCHRL § 8-102(18). "Even under its permissive standard, a plaintiff must still establish a prima facie case by demonstrating, among other things, that the accommodation requested would actually allow plaintiff to perform (or more easily perform) the essential functions of the job at issue." *Id.*; *accord Simon v. City of New York*, 2019 WL 916767, at *8 (S.D.N.Y. Feb. 14, 2019).

ii.     *Undue Hardship*

In addition to the established burden-shifting framework, the NYSHRL and NYCHRL recognize the undue hardship affirmative defense to failure to accommodate claims. Under the NYSHRL, an employer need not provide an accommodation if it "impose[s] an undue hardship on the operation of an employer's . . . business." NYSHRL § 296-3(b). An "undue hardship, like reasonable accommodation, is a relational term; as such, it looks not merely to the costs that the employer is asked to assume, but also to the benefits to others that will result." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995). An undue hardship must be analyzed "through the lens of the factors listed in the regulations, which include consideration of the industry to which the employer belongs as well as the individual characteristics of the particular defendant-employer." *Id.* Factors in the NYSHRL undue hardship analysis include, among other things, "[t]he overall size of the business . . . with respect to the number of employees" and "number and type of facilities;" "the type of operation which the business . . . is engaged in, including the composition and structure of the workforce"; and "[t]he nature . . . of the accommodation needed." *Id.* Likewise, under the NYCHRL, an employer does not need to

21

provide an accommodation if it "cause[s] undue hardship in the conduct of the [employer's] business."  NYCHRL § 8-102.

      b.  <u>Application</u>

Defendants appear to challenge only the third prong of the burden-shifting test—whether Plaintiff can show that "with reasonable accommodation, the employee could perform the essential functions of the job at issue."  *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015).  As mentioned, Plaintiff offers three proposed accommodations recommended by Dr. Assina, which Plaintiff claims are all reasonable and would allow him to continue performing his job as Section Chief of Gastroenterology at NYU.  I address Defendants' arguments as to the first two accommodations below.

Defendants argue that Plaintiff's first proposed accommodation ("A seating arrangement should be available for prolonged procedures, such as those lasting longer than 20 to 30 minutes") is unreasonable because it would negatively impact patient care and jeopardize patient safety.  (MSJ 20–21.)  NYU requires gastroenterologists to perform endoscopies in a standing position, rather than seated, so they can manipulate the scope optimally and safely, especially when faced with life-threatening conditions such as internal bleeding.  (*Id*. 21 (citing 56.1 ¶¶ 4, 46–51).)  Defendants urge that performing procedures in a seated position invariably would jeopardize patient safety in life-threatening situations.  (56.1 ¶¶ 4, 46–51; Pochapin Decl. ¶ 22; *see also* Pochapin Dep. 156:4-18 ("[I]f it was your mother who was bleeding out, I promise you you would not [want] someone in the midst of trying to get a band on a bleeding esophageal varix to sit down at that moment . . . [N]o practicing gastroenterologist in the midst of someone bleeding to death is going to say, 'I'm sorry,' after 20 minutes, 'I have to sit down.' It's not only

inappropriate, unprofessional, but it puts the patient at risk and in danger . . .").)[9]  Performing gastrointestinal endoscopic procedures was the central function of Plaintiff's job and, without the ability to perform them safely, he could no longer perform his essential job duties.  (MSJ 20–21.)

Plaintiff argues that Dr. Pochapin's opinion on Plaintiff's ability to do procedures safely wavered during his deposition testimony, and that this discrepancy, coupled with Dr. Williams's expert testimony about her experience performing procedures in a seated position, creates an issue of material fact for the jury to decide.  (Pl. Opp. 24–26.)  Plaintiff misconstrues Dr. Pochapin's testimony.  Dr. Pochapin did not testify, as Plaintiff claims, that performing endoscopies while seated is fine.  Rather, he testified that sitting during a "routine colonoscopy is fine," but emphasized that it is a core responsibility of a gastroenterologist to handle any emergency situations that may arise during an endoscopy, which is simply impossible from the seated position.  (Pochapin Dep. 157:16-25 ("This is not a routine procedure we're talking about. That would be a different discussion.  These are patients in which the endoscopist is the person who has to respond immediately to a life-threatening crisis that only he or she have the training, because the fellows are not trained to do that.  You cannot have to sit at that moment.").)  Dr. Pochapin's testimony establishes that emergency situations can and do arise during endoscopies, and the gastroenterologist performing the procedure is responsible for providing whatever life-saving care the situation requires.  (56.1 ¶ 4; Pochapin Decl. ¶¶ 8, 25.)  Since these emergency procedures generally necessitate that the gastroenterologist be able to stand as needed, (*id.*), an accommodation that disturbs Plaintiff's ability to comply is not reasonable in the hospital setting. *See also Desmond v. Yale-New Haven Hosp., Inc.*, 738 F. Supp. 2d 331, 349–50 (D. Conn. 2010)

---

[9] "Pochapin Dep." refers to the transcript of the deposition of Dr. Mark Pochapin taken on May 31, 2019.  (Doc. 107-2.)

("[S]uch an accommodation would potentially jeopardize the welfare and safety of the Defendant's patients in emergency situations, which customarily occur in hospital settings. Therefore, it does not qualify as a reasonable accommodation.")

Plaintiff also seeks to resort to Dr. Williams's opinion as evidence of a genuine dispute of material fact concerning whether with the accommodations Dr. Assina proposed Plaintiff could perform the essential functions of the job.  (*See, e.g.*, 56.1 ¶¶ 46, 50, 53.)  However, even if Dr. William's report allowed the Plaintiff to meet his burden to show that the first accommodation is facially reasonable (and, as noted, I have excluded her testimony) as to the ability to sit during procedures, Defendants would still be able to "rebut the reasonableness of the proposed accommodation," and demonstrate that "the proposed accommodation would cause the defendant to suffer an undue hardship."  *Wright*, 831 F.3d at 76 (internal quotation marks omitted); *see also Borkowski*, 63 F.3d at 137–39.  An undue hardship analysis must consider the "industry to which the employer belongs as well as the individual characteristics of the particular defendant-employer."  *Id*.  Additional factors include "the type of operation which the business . . . is engaged in, including the composition and structure of the workforce."  NYCHRL § 8-102. Patient safety is a key hospital priority.  (*See, e.g.*, Pochapin Decl. ¶¶ 22, 28 (describing patient safety as a top priority).

Defendants establish that at times patients face life-threatening situations during routine gastroenterological procedures and raised numerous safety concerns with Plaintiff's proposed accommodations.  (56.1 ¶¶ 4, 46–51; Pochapin Decl. ¶¶ 8, 22, 25; Pochapin Dep. 156:4-18, 157:6-25.)  Plaintiff offers virtually no rebuttal to these patient safety concerns, particularly given the exclusion of Dr. Williams's opinion on these points.  Such safety risks are entirely adverse to the "type of operation which [a hospital] . . . is engaged in," NYCHRL § 8-102.

Defendants argue that Plaintiff's second proposed accommodation ("[Plaintiff cannot] perform any procedures that are inherently long and require the use of heavy equipment such as lead apron") is also unreasonable. (MSJ 22–24.) Defendants contend that Plaintiff's essential job duties included many procedures that are inherently long and require lead aprons, such as ERCPs, foreign body removals, stent placements, and other procedures involving fluoroscopy. (56.1 ¶¶ 3, 5.) Plaintiff disputes that these procedures were part of his essential job duties and argues that his inability to perform them would not have been unreasonable. (Pl. Opp. 26–28.) Plaintiff does not dispute that one must wear a lead apron to perform ERCPs and other fluoroscopic procedures and does not dispute that he could not wear one due to his physical condition. (56.1 ¶ 5.) Neither Dr. Assina nor Plaintiff suggest an accommodation that would alleviate the necessity of wearing a lead apron.

Defendants argue that NYU hired Plaintiff over other qualified candidates specifically because he could perform such procedures, and, as a result, he was the only gastroenterologist who could and did perform ERCPs at NYU Langone Hospital-Brooklyn. (56.1 ¶¶ 2–3, 6–8, 11, 17.) Plaintiff admits he occasionally performed ERCPs, but states that such procedures were not included in Plaintiff's employment agreement and, regardless, that NYU outsourced these procedures before and after Plaintiff was hired. (Pl. Opp. 15, 27.) Whether these procedures are essential functions of Plaintiff's job is unclear from the record.[10] However, it is clear that if Plaintiff were able to demonstrate that ERCPs were not part of his essential job duties, his second proposed accommodation would still create an undue hardship for Defendants. The evidence shows that Plaintiff performed fluoroscopic procedures, including ERCPs, on several

---

[10] I make no determination as to whether performance of fluoroscopic procedures such as ERCPs was an essential component of Plaintiff's job.

occasions during his employment at NYU.  (56.1 ¶ 17.)  As with Plaintiff's first proposed

accommodation, Plaintiff's inability to perform any procedures that are inherently long and

require the use of heavy equipment such as lead apron not only risks patient health and safety,

particularly in emergency situations, but also forces other employees to cover the procedures for

him.  (*See, e.g.*, Volpicelli Dep. 39:24-40:10, 40:17-42:13, 69:10-20, 76:3-9, 97:20-21; Pochapin

Dep. 119:9-120:12; Pochapin Decl. ¶ 15 (discussing other physicians' increased coverage

schedules and the reassignment of gastroenterologists from other hospital locations to cover the

necessary tasks during Plaintiff's leave of absence).)[11]  Additionally, since Plaintiff was the only

gastroenterologist able to perform certain of these procedures, a proposed accommodation that

would render him fully incapable to execute them inevitably creates hardship for Defendants.[12]

I find that the evidence in the record could not "reasonably support a jury's verdict" that

Plaintiff's proposed accommodations were reasonable, and that the proposed accommodations

would not create an undue hardship for Defendants and their hospital.  *Marvel Characters, Inc.*,

310 F.3d at 286.  Therefore, I grant summary judgment in favor of Defendants on Plaintiff's

failure to reasonably accommodate claims under the NYSHRL and NYCHRL.

### 3. Breach of Contract

Finally, Plaintiff claims that Defendants breached his employment agreement with NYU.

Plaintiff's employment agreement contained the provision:  "Application of the termination

provision related to disability shall occur only after engagement in the interactive process and

---

[11] "Volpicelli Dep." refers to the transcript of the deposition of Dr. Frank Volpicelli taken on May 28, 2019.  (Doc. 107-3.)

[12] Dr. Assina's proposed accommodations provide that Plaintiff could return to work, but only with the implementation of three permanent accommodations.  (56.1 ¶ 40.)  Nowhere does Plaintiff argue that implementation of any less than all three proposed accommodations would allow him to return to work.  Because I find that the first proposed accommodation was unreasonable and created an undue hardship for Defendants, and the second created an undue hardship, and both were, therefore, not plausible, I need not determine whether the third proposed accommodation was unreasonable or created an undue hardship.

consideration of reasonable accommodation requests in accordance with federal, local and state regulations." (Compl. ¶ 61; *see also* Pl. Opp. Ex. Z at 9.) Plaintiff argues Defendants breached the provision by "fail[ing] to engage in the interactive process" and by "refus[ing] Plaintiff's accommodations." (Pl. Opp. 39–40.)

In assessing a claim for failure to reasonably accommodate, "[t]he employer's decision to engage in or forgo an interactive process is but one factor to be considered in deciding whether a reasonable accommodation was available for the employee's disability." *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 11 N.E.3d 159 (2014); *see also Lazzari v. New York City Dep't of Parks & Recreation*, 751 F. App'x 100, 103 (2d Cir. 2018). Failure to engage in the interactive process is not a standalone claim and cannot serve as "an independent basis for liability." *Wellner v. Montefiore Med. Ctr.*, 2019 WL 4081898, at *11 (S.D.N.Y. Aug. 29, 2019).

Because I find that Plaintiff does not offer any facially reasonable accommodation requests, I need not analyze Plaintiff's failure to engage in the interactive process allegations as part of his NYSHRL or NYCHRL claims. However, it is clear that Defendants sufficiently engaged in the interactive process. Plaintiff argues that Defendants' failure to engage in the interactive process violates the contractual obligations in Plaintiff's employment agreement and asserts that Defendants should be held liable for breach of contract. To demonstrate that a defendant-employer failed to engage in an interactive process, a plaintiff can point to the defendant's failure to take certain steps such as "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the

request is too burdensome." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc*., 263 F.3d 208, 218–19 (2d. Cir. 2001).

Here, Dr. Volpicelli and Dr. Pochapin engaged in several conversations with Plaintiff about his medical condition.  (*See* 56.1 ¶ 29 ("Plaintiff communicated with Dr. Volpicelli and Dr. Pochapin regarding his medical status and his ability to return to work from March 2017 through August 2017"); *id*. ¶¶ 19–20 (Dr. Volpicelli discussed Plaintiff's initial diagnosis, its effects on Plaintiff's work, and Plaintiff's next steps with Plaintiff).)  Taveras was also in contact with Plaintiff about his medical condition, medical leave, required documentation, long-term disability benefits, and employment status.  (*See id.* ¶¶ 31–32.)  Significantly, NYU did not terminate Plaintiff's employment when his leave of absence expired, but rather extended his leave, continued to communicate with him and solicited updates about his condition.  (*Id.* ¶ 33.)  With regard to Plaintiff's requested accommodations, NYU's Division of Gastroenterology, Department of Medicine, and Department of HR met to review, analyze, and discuss Dr. Assina's findings and their impacts on Plaintiff's employment.  (*Id.* ¶ 41.)  These conversations involved at least eleven managers, chairs, administrators, chiefs, and vice presidents of various departments.  (*Id.* ¶¶ 42–44.)  The representatives circulated multiple drafts of the final document to the Department of Medicine and Department of HR and provided revisions and comments. (*Id.* ¶ 47.)  In addition, when Taveras communicated the decision by NYU to terminate Plaintiff's employment, Plaintiff "requested an opportunity to have a follow up discussion with [Dr. Assina] to provide additional medical documentation about accommodations for [NYU] to review."  (*Id.* ¶ 51.)  Taveras agreed to that request, asking that Plaintiff provide the documentation within the two days Plaintiff had indicated he needed to gather the material, and stating that if such documentation was not provided by October 16, 2017, NYU would "release

[Plaintiff] from [his] position." (*Id.*)  Plaintiff did not provide any documentation, and NYU terminated Plaintiff's employment on October 17, 2017.  (*Id.* ¶ 52.)  I find these steps *establish* that Defendants took the necessary steps to thoroughly engage in the interactive process, including but not limited to, commencing discussions with Plaintiff about his medical condition and employment status, requesting and considering information about the underlying issue and proposed accommodations, and, overall, considering Plaintiff's requests.

For these reasons, I reject Plaintiff's failure to engage in the interactive process allegations in connection with his claim for breach of his employment agreement.  Since I also find that Defendants engaged in the interactive process when they decided to reject Plaintiff's "accommodation requests in accordance with federal, local and state regulations," as provided in his employment agreement, (Compl. ¶ 61; *see also* Pl. Opp. Ex. Z at 9),  Defendants' motion for summary judgment on Plaintiff's breach of contract claim is granted.

## V.    <u>Conclusion</u>

For the foregoing reasons, Defendants' motion to exclude the testimony of Dr. Williams is GRANTED, and Defendants' motion for summary judgment is also GRANTED and Plaintiff's claims are dismissed in their entirety.

The Clerk's Office is respectfully directed to terminate any open motions and close the case.

SO ORDERED.

Dated: July 24, 2023
     New York, New York

Vernon S. Broderick
United States District Judge